ALEXANDER GEORGE McCARTHY, III *v.*
STATE OF MARYLAND

[No. 13, September Term, 1974.]

*Decided September 23, 1974.*

The cause was argued before MORTON, THOMPSON and POWERS, JJ.

*Howard L. Cardin, Assigned Public Defender,* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Richard J. Kinlein, State's Attorney for Howard County, Milton B. Allen, State's Attorney for Baltimore City, Robert N. Dugan* and *John F. Murphy, Assistant State's Attorneys for Baltimore City* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

Alexander George McCarthy, III, the appellant, was convicted of several violations of the controlled dangerous substances law; all of the counts arose out of the seizure of substances under a search warrant issued for appellant's home, Apartment A, 2668 Gatehouse Drive, in Baltimore City. The case was tried in the Circuit Court for Howard County, Judge James Macgill presiding with a jury. Sentences totaling five years were imposed. The issues raised on appeal consist of the validity of the search warrant and the sufficiency of the evidence to support the convictions. We shall first discuss the validity of the warrant.

The affidavit was executed by Officer John W. Nock who stated that: (1) he had thirteen years of experience with the Baltimore Police Department; (2) he had completed a two-week course in narcotics and dangerous drugs given by the Federal Bureau of Narcotics; and (3) he had personally

made 80 arrests for narcotic violations during the past nine months.

## FIRST INFORMANT

The affidavit recited the credibility of this informant in the following language:

"Informant has given members of the Baltimore City Police Department information in the past, consisting in one instance of two cases of violation of Burglary Laws in the State of Maryland, one occurred in Baltimore City and the other occurred in Baltimore County, which led to the arrest of two persons. In addition, said Informant has given reliable information in the past which has led to the arrest of two persons for violation of the Narcotic Laws of the State of Maryland. Said Informant has never been known to give unreliable information in any instant to Your Affiant in the past."

The affidavit alleged that on May 26, 1970, between the hours of 8:30 and 9:30 a.m., a drug addict exhibited to the informant prohibited drugs, claiming that he had purchased them from Alexander McCarthy and Tony Ingrassia at 355 Front Hill Avenue, Baltimore. On May 27, the informant accompanied a drug addict to the above address between the hours of 3 and 3:30 and observed the addict purchase, for the sum of $5.00, a bag from Ingrassia who stated that the bag contained dilaudid. At 7:30 a.m. on May 27, Ingrassia told the informant that he was waiting for Al McCarthy to "come to his house" with the drugs. The informant further stated that on May 27 and May 28 he was in the neighborhood of 355 Front Hill Avenue between the hours of 8:30 and 9:00 a.m. and saw Alexander McCarthy, driving a 1969 Pontiac LeMans, steel gray, black vinyl top, Maryland Registration HA-2036, enter the Front Hill address on both dates. That on May 30, 1970, the informant had stated to your affiant that "the Informant asked Ingrassia how far does Al (referring to McCarthy) have to go to get the stuff, to which Ingrassia replied, 'out his house'."

The informant stated that on June 2, 1970 between 9:00 and 9:30 p.m., Ingrassia informed the informant he was out of drugs and he wouldn't have anything until the morning when Al got there. The informant further stated that he took a narcotic addict to 355 Front Hill Avenue on June 3, 1970, at approximately 12:45 p.m. The drug addict entered and returned with two bags of dilaudid stating he had purchased one from McCarthy and one from Ingrassia which they had removed from their pockets. That on June 4, at 10:50 a.m., the informant together with a drug addict went to the 355 Front Hill Avenue address and purchased two bags of dilaudid from Ingrassia. At that time, the vehicle described hereinbefore was parked in front of 355 Front Hill Avenue.

The informant stated that he had observed the McCarthy operation in the past several weeks and found that between 8:30 and 9:00 a.m. McCarthy arrived in the motor vehicle hereinbefore described and entered 355 Front Hill Avenue carrying the drugs. The informant stated that on at least one occasion he had personally observed McCarthy and Ingrassia cut and bag these drugs at the 355 Front Hill Avenue address immediately after McCarthy delivered them. The informant stated that at this point McCarthy would leave the premises and Ingrassia would sell the drugs during the rest of the day. The informant further stated that he had personally purchased prohibited narcotics from McCarthy several times: one year earlier, 3 months earlier and 2 to 3 weeks earlier.

## SECOND INFORMANT

The credibility of this informant was recited as follows: "Based on information which he has given to members of the C.I.D. Narcotic Unit in the past which has led to an undercover buying and seizure of fifty-five capsules of heroin hydrochloride during June of 1970."

On May 26, 1970, this informant advised the affiant that he went to 355 Front Hill Avenue in the company of detectives from the C.I.D. Narcotic Unit, in an attempt to purchase narcotic drugs. Ingrassia informed him that he

was out of drugs, "that McCarthy wasn't there at the time and, therefore, he wasn't in shape." Based on his experience the affiant stated "in shape" to mean possession of prohibited narcotic drugs.

### THIRD INFORMANT

The credibility of this informant was established as follows: "This Informant has given Your Affiant information in the past which has resulted in the arrest of seven persons during the month of March, 1970, for violations of narcotic laws of the State of Maryland." He stated that during the past two weeks he had purchased dilaudid from Ingrassia in the area of Pratt and Monroe Streets.

### AFFIANT'S OBSERVATIONS

The affiant determined that the vehicle registration HA-2036 was in the name of Dianna Theresa D'Anna, 2803 Arlene Circle, 21207. He examined the records of the Court of Common Pleas and found that Alexander McCarthy is currently married to Dianna T. McCarthy, maiden name Dianna T. D'Anna and that he had received information from Lieutenant Thomas J. Coppinger in the State's Attorney's Office that Mrs. McCarthy was employed in the Assignment Office of the State's Attorney's Office and that she had stated many times that she and her husband lived together. Her address on the official records of the State's. Attorney's Office was 2668 Apartment A Gatehouse Drive, Baltimore, Maryland 21207.

The affiant's observations of activities of either Ingrassia or McCarthy were limited to a short period on May 26, 1970, that is between 8:20 and 9:30 a.m. He observed at 8:40 a.m. Alexander McCarthy enter the premises at 355 Front Hill Avenue and that at 9:05 a.m. he saw a person known to him as a user of prohibited narcotics enter the premises and leave approximately five minutes later.

Based upon this affidavit a warrant was issued authorizing the search of the premises at 355 Front Hill Avenue, the apartment at 2668 Apartment A Gatehouse Drive 21207 and the Pontiac car.

Appellant attacks the validity of this search warrant on a wide-ranging basis. First on the basis that the credibility of the informants was not shown therein as required by the veracity prong of *Aguilar v. Texas*, 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964), as explicated in *Spinelli v. United States*, 393 U. S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969). In making his attacks, he relies primarily upon earlier cases of this Court. His reliance is misplaced inasmuch as the Court of Appeals in *State v. Edwards*, 266 Md. 515, 517, 295 A. 2d 465 (1972) found an informer credible where the allegation was as follows:

"[W]e sent a informant who has been reliable in the past giving information in 12 cases of Narcotic violations to this location."

and *State v. Kraft*, 269 Md. 583, 585, 307 A. 2d 683 (1973), *cert. denied*, 94 S. Ct. 2408, where the reliability was shown as follows:

"[I]nformation from a reliably established informant, who is responsible for eleven narcotics arrests."

We cannot hold that the allegations in this case do not establish the credibility of the informants because, of course, decisions of the Court of Appeals of this State are binding upon this Court. The appellant does not discuss *Edwards* but he attempts to distinguish *Kraft* on the basis of a strong dissent which we are precluded from following. We also note the Supreme Court of the United States had denied certiorari on the case. He further attempts to distinguish *Kraft* on the basis that there were eleven arrests as to the first informant, herein there were only two arrests involving four persons. We do not think this distinction is valid nor are we impressed with the argument the information must deal with narcotics rather than other kinds of offenses. Certainly credibility may be established through accurate information regardless of whether furnished exclusively in narcotics cases or in other types of criminal cases.

Appellant also points to the sparsity of observations offered by the affiant in the instant case when compared to the affiant's observations in *Kraft*. This has no bearing on the credibility prong of *Aguilar* and *Spinelli*. *Stanley v. State*, 19 Md. App. 507, 533, 313 A. 2d 847 (1974). In either case, the observations were not themselves sufficient to establish credibility of the informant; yet the Court in both *Kraft* and *Edwards* accepted the informants' credibility as being established.

The appellant also attempts to apply to Ingrassia the *Aguilar-Spinelli* criteria for evaluating the credibility of an unnamed police informant. Although we have discussed the trustworthiness of hearsay reports from non-police controlled secondary sources in the terms of the *Aguilar-Spinelli* test, when faced with this specific problem Judge Charles E. Moylan, speaking for the Court held in *Thompson v. State*, 16 Md. App. 560, 567, 298 A. 2d 458 (1973):

"We believe a like reasoning to apply to the unnamed street seller at bar. Though from the criminal milieu, to be sure, he was not, wittingly at least, working with the police. He was not in the position of 'the common informant . . . hidden behind a cloak of anonymity' who more often than not 'is paid or provides information in exchange for immunity from prosecution for his own misdeeds.' *People v. Glaubman*, 485 P. 2d 711, 716-717 (Colorado, 1971). This street seller was, so far as he knew, engaged in a purely commercial venture for his own profit. He was dealing with a regular and presumably valued customer. Being unable initially to satisfy his customer's demand, it was to his every advantage to assure the prompt return of that customer as soon as fresh merchandise was available for sale. He simply had no purpose in misleading his own clientele. The circumstances in which the seller passed on the information to a customer and confidant are replete, we think, with reasonable assurances of trustworthiness."

On the same reasoning we hold that the veracity of Ingrassia was established in the instant warrant.

Of course, the observations of the affiant in the office of a clerk of the Court of Common Pleas and the statement of Lieutenant Coppinger can be challenged neither on the basis of credibility of the witness nor on his basis of knowledge.

Continuing his attack; appellant argues that, conceding veracity *arguendo,* there was nothing to show the basis of knowledge required by *Aguilar* and *Spinelli.* He does not argue that the basis of knowledge of the police informants was not shown because obviously how they acquired their information was completely set out, but once again, seeking to apply to the non-informant or secondary source declarant the rules developed by *Aguilar* and *Spinelli* for unnamed police controlled informants, he argues there is nothing in the affidavit to show how Ingrassia obtained his information that the drugs were kept at the home of the appellant. He argues that in *Stanley v. State, supra,* we indicated that if the affidavit failed to set out what the informant saw, heard or smelled that provided the basis of his knowledge, the only other basis could be the detail of the information which he furnished which would itself show that the knowledge was firsthand. Once again appellant assumes that the *Aguilar-Spinelli* rules developed for unnamed informants would apply as well to third persons and further argues that *Stanley* indicated there was no other way in which the basis of knowledge prong of *Aguilar-Spinelli* could be established. We think he reads too much into *Stanley;* we held simply that detail was one way in which the basis of knowledge prong of an unnamed informant could be established and that detail could not supply evidence of credibility to satisfy veracity requirements. Once again we point out that Ingrassia was not an unnamed police informant, in fact he was not aware at all that he was informing the police of anything. Indeed, we are sure that had he thought so, he would not have given out any information.

Ordinarily, in such cases the basis of the knowledge of the

person actually giving the information is obvious. See cases reviewed in *Thompson v. State, supra*:

> "Although the rationale was not always neatly pigeonholed for convenience of later analytic synthesis, and although additional reasons based on practical necessity were sometimes advanced, the decisions of the Court of Appeals and of this Court have long portended that hearsay information may be furnished under circumstances reasonably insuring its reliability, even absent any knowledge as to its source's credibility. *Jones v. State*, 242 Md. 95, 100-101 (reliable information furnished by a rape victim, a named witness, and several other unidentified witnesses); *Taylor v. State*, 238 Md. 424, 429-431 (reliable information furnished by an unidentified witness to a robbery); *Evans v. State*, 11 Md. App. 451, 455-459 (reliable information furnished by an unknown robbery victim); *Ward v. State*, 9 Md. App. 583, 590-592 (reliable information furnished by two cleaning maids at a motel who observed narcotics in a motel room); *Knight v. State*, 7 Md. App. 282, 285-286 (reliable information furnished by two witnesses to a crime); *Edwards v. State*, 7 Md. App. 108, 112, f. 1 (reliable information furnished by one confessing to a crime, in the course of which confession he implicated another); *Grimm v. State*, 6 Md. App. 321, 326-328 (reliable information furnished by a taxicab driver); *Boone v. State*, 2 Md. App. 80, 93 (reliable information furnished by one confessing to a crime, which confession implicated another). *Id.* at 566-67.

We see no reason why the *Thompson* approach to satisfying the veracity prong of *Aguilar* and *Spinelli* is not also valid to establish the basis of knowledge prong.

This Court and the Court of Appeals have for some time treated non-police controlled, named citizen informants differently than the stereotyped anonymous police informant.

The principal difference in approach, as evidenced by the holding in *Thompson v. State, supra,* has been that the formal requisites for establishing veracity or basis of knowledge enunciated in *Aguilar* and *Spinelli* and their progeny have not been deemed applicable to the non-police controlled named citizen informant.

This theory was clearly adopted by Chief Judge Murphy speaking for the majority in *Mobley & King v. State,* 270 Md 76, 310 A. 2d 803 (1973):

> "We are in full agreement with the opinion of the Court of Special Appeals that a different rationale exists for establishing the reliability of citizen-informers than for establishing that of the more suspect and anonymous police informer; and 'that the strictures of *Aguilar v. Texas* . . . [*supra*] and *Spinelli v. United States* . . . [*supra*] are aimed primarily at unnamed police "informers" rather than at that broad class of secondary sources who are the victims of crime, the disinterested witnesses of crime, other disinterested civilian sources of information or other law enforcement officers.'" *Id.* at 85.

In *Dawson v. State,* 11 Md. App. 694, 276 A. 2d 680 (1971), this Court stated at page 699:

> ". . . in dealing with a named source, the very naming of the source and the relationship of the source to the observed information may go a long way (or even be sufficient unto itself), under the facts of a particular case, to establish the credibility of that source or the reliability of his information."

The crucial question in the instant case is, of course, how did Ingrassia know the drugs were kept at the home of the appellant. Obviously there is nothing directly in the affidavit to show how he acquired his knowledge. We must look at inferences from other portions of the warrant. The first informant whose reliability we have accepted, shows

that Ingrassia and the appellant were engaged in daily contact over a period of many weeks in the illegal sale of drugs. This to us is sufficient to support an inference that Ingrassia knew much about the appellant's operations, either by observation or from admissions by the appellant. When he gave the information that the drugs were kept at appellant's house, he had no reason to so state if it were not true. The information appears to be given only as an indirect reply to a request for information as to how long it would be before the drugs were delivered to Ingrassia. There is no reason to fear, as the Court did in *Spinelli v. United States, supra* at 416, that Ingrassia was relying on a "casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation" nor that "this meager report could easily have been obtained from an offhand remark heard at a neighborhood bar." (*Id.* at 417.) Persons conspiring together daily to violate the narcotic laws would hardly rely on such unsubstantial sources in obtaining information concerning the other's operations. We have previously held that the basis of knowledge prong could be established by other than direct statements of the person giving the information or detail thereof. *See Frey v. State*, 3 Md. App. 38, 237 A. 2d 774 (1968) and *Sessoms v. State*, 3 Md. App. 293, 239 A. 2d 118 (1968), the former opinion written by Chief Judge Robert C. Murphy. We hold that Ingrassia's basis of knowledge in the instant case was also established by reference to the other facts disclosed in the affidavit.

Appellant continues his attack upon the warrant, assuming the veracity of the informants and their basis of knowledge were established, by alleging that the warrant still does not furnish probable cause to search the premises of the appellant. He points to the sparsity of direct allegations in the affidavit concerning his home as follows:

"1. Page 6 — 'Further, it is the expert conclusion of Your Affiant, based on the admissions of Ingrassia as well as the total information provided by all three informants and Lieutenant Thomas J.

Coppinger that the afore-described Alexander McCarthy is currently maintaining 2668 Apart A Gatehouse Drive 21207 as a nuisance house for the purpose of storing prohibitive narcotic drugs.'

"2. Page 5 — 'Alexander McCarthy is currently married to one Dianna T. McCarthy, maiden name Dianna T. D'Anna. Your Affiant further has received information from the State's Attorney's Office in Baltimore City through Lieutenant Thomas J. Coppinger that Dianna T. McCarthy, formerly D'Anna, is currently employed by the Assignment Office of the State's Attorney's Office, and further, that on many occasions in the presence of Lieutenant Coppinger, she has indicated that her husband's place of residence is the same as her's. The address listed to the McCarthy's in the State's Attorney's Office files is 2668 Apartment A Gatehouse Drive, Baltimore, Maryland 21207.'

"3. Page 3 — 'Prior to that date, on May 30, 1970, the Informant stated to Your Affiant that the Informant asked Ingrassia how far does Al (referring to McCarthy) have to go to get the stuff, to which Ingrassia replied, "out his house." ' "

While we agree that the information in the warrant concerning the probability that drugs were stored at Apartment A 2668 Gatehouse Drive was meager, we think the above quoted allegations in their totality with the surrounding circumstances, *i.e.* when considered in context with the other allegations showing daily contact between Ingrassia and McCarthy, are sufficient to establish probable cause. In arguments concerning the validity of search warrants it is frequently overlooked that we are searching only for probable cause and not guilt beyond a reasonable doubt. *Lomax v. State,* 16 Md. App. 502, 505, 298 A. 2d 454 (1973). While we agree that the evidence recited would be shy of what is necessary to establish guilt beyond a reasonable doubt, we find it to be well within the experience of reasonable men, particularly an officer trained in the field

of narcotics, to believe that drugs were kept at the appellant's home.

The appellant's reliance on *Scott v. State,* 4 Md. App. 482, 243 A. 2d 609 (1968) is also misplaced. In that case several days' observations showed Scott to have received and stored stolen items at his shop. Despite the daily observations, there was absolutely nothing to show that any of the goods was ever delivered to his home, albeit one day a vehicle with stolen goods was kept under observation until it arrived at the appellant's home. There was, however, no allegation that any stolen goods were taken from the vehicle to the home. In a second instance a vehicle carrying stolen goods from the shop was observed transferring the goods from one car to another at the appellant's home. Once again there was no showing that any of the goods had been delivered into the home. In the instant case we have a statement by a witness we have found to be reliable that the drugs were kept in the home.

We conclude that a reviewing magistrate could well have found, as do we in discharging our constitutional obligation to review facts involving questions of constitutional law, that the appellant probably possessed illegal drugs at his home at Apartment A 2668 Gatehouse Drive, Baltimore, Maryland 21207.

Appellant also argues that the evidence was insufficient to support the convictions. After pointing out that no drugs were found at the home of Ingrassia, that no drugs were found in the Pontiac car, he states as follows:

"The second search involved a clothes closet located in the bedroom apparently shared by Mr. and Mrs. McCarthy. The closet contained both 'ladies and mens garments'. The officer picked up a woman's vest and in the pocket—in a paper bag— was a minimal amount of 'soft' controlled dangerous substances. These were not the items allegedly known to be associated with the Appellant; nor where they in such a quantity as to indicate that this was a 'stach' (i.e. — a storing

location for drugs). Instead the amount and type of drugs recovered indicated that they were the personal supply of the owner of the vest — Dianna McCarthy.

"Officer Nock testified that the vest in question was a 'brown lady's type vest' which contained the articles in question. One group of articles was 'one white envelope containing a vegetable type material . . . 3 packages of wrapping paper and one pre-rolled cigarette,' which were analyzed as marihuana. Eighteen purple tablets analyzed as L.S.D. and 3 orange and blue tablets which were found to be methamphetamine pentobarbital (otherwise known as diet pills). All these items were found in the lady's vest which was identified by Dianna McCarthy as belonging to her. The amounts were small and were kept by her for her own personal use. There was no evidence or inference that the Appellant had put the items in the vest or that he was even aware that they were there. In fact, Mrs. McCarthy testified that her husband, the Appellant was unaware of their existence. She described how she obtained the L.S.D., the marihuana and the diet pills. The Appellant himself also testified that the items were not his and that he had no knowledge of their presence in the closet shared by he and his wife."

To support his argument he relies on *Barksdale v. State*, 15 Md. App. 469, 291 A. 2d 495 (1972) where we found the evidence insufficient to support the conviction of a man where the only drugs found were inside the purse of a woman who was present at the time of the raid. Appellant's argument might be well founded except for the following facts which to our mind destroy the analogy with Barksdale. The officer finding the drugs testified as follows:

"As I was searching the closet in the master bedroom Mr. McCarthy said to me, 'Someone

already searched that closet,' and I, at this time, I said, 'Well, I'm going to search it again.' "

* * *

"Q. All right, what then happened, sir?

A. At this time Mr. McCarthy, his exact words to me were, if I recall, to the best of my recollection, he said, 'Christ, what'd you, what'd you have to search again for? ' or some words to that effect. 'The other fellow missed it.' And at this time I then took the items out of the bag — either I took them out or Officer Nock took them out. This is the time when he identified each one, each item.

Q. And how did he identify them?

A. As we took the, for instance the vial, which contained a piece of brown substance which was later analyzed to be hashish, he said, 'That's hash.' As to the tablets, he said, 'That's acid,' meaning LSD. And so forth."

*Judgments affirmed.*